UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JASON DARNELL LOTTS,

               Petitioner,                                      Hon. Janet T. Neff

v.                                                   Case No. 1:08-CV-908

CAROL HOWES,

               Respondent.

_____/


**REPORT AND RECOMMENDATION**

This matter is before the Court on Lotts' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Lotts' petition be **denied**.


**BACKGROUND**

This matter arises from the December 16, 2002, killing of Alduel Jabar Dean.  As a result of events that occurred on or about this date, Petitioner was charged with: (1) murder; (2) possession of a firearm during the commission of a felony; and (3) being a felon in possession of a firearm.  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

1

**Katherine VanDevoren**

At approximately 8:30 p.m. on June 15, 2002, VanDevoren drove to the gas station at 1560 Lake Drive in Grand Rapids.  (Trial Transcript, December 1, 2004, 41).  While VanDevoren was standing outside the gas station she heard gunshots.  (Tr. 42).  When VanDevoren looked around she saw a black male leaning "outside the passenger window and over. . .the roof of the car and shooting."  (Tr. 42).  Van Devoren heard approximately nine gunshots.  (Tr. 42).  Jabar Dean was also at the gas station and witnessed the shooting.  (Tr. 43-53).

Several months after this incident, VanDevoren was subpoenaed to testify at a preliminary examination.  (Tr. 52).  While at the courthouse, VanDevoren encountered Jabar Dean, who had also been subpoenaed to testify.  (Tr. 52).  While the two were waiting to testify, Dean stated, "if I testify, they'll kill me."  (Tr. 52).  Dean was not "joking," but instead was "very seriously frightened."  (Tr. 52).  Dean testified at the preliminary examination.  (Tr. 56-57).

**Josh Mollan**

As of June 15, 2002, Mollan was employed as a police officer for the City of Grand Rapids.  (Trial Transcript, December 1, 2004, 58).  At approximately 8:45 p.m. that evening, Mollan arrived at the gas station at 1560 Lake Drive.  (Tr. 58).  Mollan recovered nine 9-millimeter shell casings from the scene.  (Tr. 61).  Officer Mollan also spoke with Jabar Dean.  (Tr. 58-59).  Dean informed Mollan that "he thought" Darrell Mitchell and a man named Johnny were responsible for the shooting.  (Tr. 62).  Dean did not indicate that either of these men "was the guy pulling the trigger," only that they "were behind the shooting."  (Tr. 67).

2

**Greg Bauer**

As of November 19, 2002, Bauer was employed as a police officer for the City of Grand Rapids.  (Trial Transcript, December 1, 2004, 69).  That evening, Bauer was dispatched to 1440 Fuller to investigate a report that gunshots had been fired into a vehicle.  (Tr. 69-70).  When Officer Bauer arrived at this location he observed a vehicle with "several holes in the side."  (Tr. 70).  Alduel Dean reported that "he was driving on Kalamazoo Avenue by Hall Street when some - several people or some suspects unknown to him shot at him in his car."  (Tr. 70).  An investigation of the scene of the shooting revealed the presence of sixteen 9-millimeter shell casings.  (Tr. 72-73).

**Darrell Singleton**

Singleton testified that he was employed as an administrative lieutenant for the Kent County Sheriff's Department.  (Trial Transcript, December 1, 2004, 84).  Singleton testified that as of December 16, 2002, Johnny Greer was incarcerated in the custody of the Cass County Sheriff's Department.  (Tr. 89-91).

**Erik Boillat**

Boillat testified that he had been employed as a detective for the Grand Rapids Police Department for approximately five years.  (Trial Transcript, December 1, 2004, 92).  Boillat indicated that he worked with the "major case" team which dealt (in part) with street gangs in the Grand Rapids area.  (Tr. 92-93).  Detective Boillat identified the U&Ts and Lafayette as two of the gangs operating in Grand Rapids.  (Tr. 93-96).  In 2002, the relationship between these two particular gangs was "very volatile."  (Tr. 96).  According to Boillat, "Lafayette and U&T were

3

Hatfield and McCoy essentially."  (Tr. 110).

Detective Boillat indicated that Darrell Mitchell was associated with the Lafayette gang and was known on the street as "D Mitch" or "Dad."  (Tr. 97-98).  Mitchell's rank in the Lafayette gang was "near the top."  (Tr. 99).  Vaughn Hill associated with Mitchell for "business transactions" and was known on the street as "Weewee."  (Tr. 97-98).  Johnny Greer was one of Mitchell's "soldiers," acting as "an enforcer" and "would do shootings, things of that nature" as Mitchell directed.  (Tr. 97-99).  Johnny Greer was known on the street as "Johnny B," "B," "Bud," and "Bud, Jr."  (Tr. 97).  Petitioner associated with Darrell Mitchell and Johnny Greer and was known on the street as "Jay" or "green eyes."  (Tr. 99-100).  Alduel Jabar Dean was associated with the U&Ts gang.  (Tr. 100-01).  Detective Boillat testified that as of December 16, 2002, Jerry Boss, known on the street as "JB," was incarcerated in the Kent County Correctional Facility.  (Tr. 101).

**David McCastle**

McCastle was presented to authenticate a tape recording of a 911 call received by Muskegon County Central Police Dispatch on December 16, 2002.  (Trial Transcript, December 1, 2004, 130-37).  The tape of the recording in question was played for the jury.[1]  (Tr. 137).

**Douglas Roesler**

Roesler testified that he was a Sergeant with the Michigan State Police, assigned to the traffic services section.  (Trial Transcript, December 1, 2004, 140).  Roesler testified that part of his responsibilities included reconstructing traffic crashes and assisting at crime scenes.  (Tr.

---

[1]  A transcript of the call in question was not included in the record.

140).  Roesler created a scale map of the "area located in Muskegon Heights around the Peck Street, Broadway Avenue intersection and surrounding couple of blocks in that area."  (Tr. 141-44). Roesler also created a scale map "which includes the area of Broadway Avenue and formerly the Rush Street bar, the area of the street and some areas across the street from the bar location."  (Tr. 144-45).  Sergeant Roesler testified that he created these maps using a device called "Total Station," an electronic transit that measures distances as well as horizontal and vertical angles and which is accurate to less than an inch at a distance of one-quarter mile.  (Tr. 140-42).

**Neil Siebert**

As of December 16, 2002, Siebert was employed as a road patrol officer for the Muskegon Heights Police Department.   (Trial Transcript, December 1, 2004, 155).   At approximately 1:23 a.m. that morning, Siebert was dispatched to the "area of Peck and Broadway" in Muskegon Heights.  (Tr. 155).  When he arrived on the scene, Officer Siebert observed Jabar Dean lying on the ground with "a lot of blood coming out of his head."  (Tr. 156-59).  Dean was lying next to a blue Cadillac and a Cadillac Escalade truck was also present.  (Tr. 157).

**Calvin Mahan**

As of December 16, 2002, Mahan was employed as a detective for the Muskegon Heights Police Department.  (Trial Transcript, December 1, 2004, 175-76).  Early that morning, Mahan was dispatched to the vicinity of Peck and Broadway in Muskegon Heights to assist in the investigation of a homicide.  (Tr. 176).  A black Escalade was present at the scene, which was parked "in front of" a blue Cadillac.  (Tr. 177-78).  An investigation of the crime scene revealed four

5

9-millimeter shell casings, as well as two bullet fragments.  (Tr. 181-82).  Detective Mahan also reported that there were two "completely separate sets of lights" on Peck Street, one set of streetlights "on top of posts that are secured into the sidewalks" and another set of streetlights "up over on tall poles."  (Tr. 179).


**Joyce DeJong**

DeJong testified that she was a physician and specially trained in anatomic pathology and forensic pathology.  (Trial Transcript, December 2, 2004, 5-6).  Dr. DeJong was permitted to testify as an expert in the area of forensic pathology.  (Tr. 6).  On December 17, 2002, Dr. DeJong performed an autopsy on Alduel Dean.  (Tr. 6).  This examination revealed that Dean suffered gunshot wounds to the following areas: (1) right gluteal region, (2) right shoulder, (3) left arm, and (4) head.  (Tr. 7-8).  Bullet fragments were recovered from Dean's body and given to the police. (Tr. 9).  Dr. DeJong also recovered from Dean's scalp a "little piece" of a bullet jacket.  (Tr. 9).  This item was also given to the police.  (Tr. 9-10).  Dr. DeJong testified that Dean died as the result of "multiple gunshot wounds."  (Tr. 14).  She characterized Dean's death as a homicide.  (Tr. 14-15).


**Dennis Davis**

As of December 16, 2002, Davis was employed as a Muskegon Heights police officer.  (Trial Transcript, December 2, 2004, 16).  Early that morning, Davis was dispatched to the area of Peck and Broadway in Muskegon Heights.  (Tr. 16).  Officer Davis assisted in the investigation of the crime scene.  (Tr. 17-19).  Davis observed a blue Cadillac and a black Escalade at the crime scene.  (Tr. 19).  The blue Cadillac was registered to William Davis of Grand Rapids.

(Tr. 20-21).  The Escalade was registered to Jeffrey Dean from Grand Rapids.  (Tr. 21).

**Gary Cheatum**

As of December 16, 2002, Cheatum was employed as a Muskegon Heights police officer.  (Trial Transcript, December 2, 2004, 24).  Early that morning, Sergeant Cheatum was dispatched to the area of Peck and Broadway in Muskegon Heights to investigate a shooting.  (Tr. 24).  Cheatum indicated that a business named "Rush Street" was located at the corner of Broadway and Henry, approximately eight-tenths of a mile from the scene of the shooting.  (Tr. 35-36).

At the scene, Cheatum spoke with Fatina Harris (a.k.a. Polly), who initially reported that the perpetrators fled the scene in a black SUV, specifically a Lincoln Navigator.  (Tr. 25). Cheatum provided this information to Central Police Dispatch (CPD).  (Tr. 25).  Harris shortly thereafter corrected herself and reported that the perpetrators fled in a GMC Yukon.  (Tr. 26). Sergeant Cheatum provided this corrected information to CPD.  (Tr. 26).  Cheatum testified that a Navigator and Yukon "look alike as far as the height with [the] only difference to distinguish [them] if you see it at night would be the front grill of the vehicle."  (Tr. 26).

Harris identified the shooter as a light-skinned black male, approximately five feet three inches tall, with light colored eyes. (Tr. 32-33).  Harris reported that "the shooter's street name might be Weewee."  (Tr. 34).  Harris also reported that there were three or four people in the black SUV that fled the scene.  (Tr. 34).

**Russell Richards**

As of December 16, 2002, Richards was employed as the manager of Rush Street and the Blue Note bar, separate businesses located adjacent to each other in the same building.  (Trial Transcript, December 2, 2004, 58).  The security system utilized by these businesses employed approximately twelve cameras positioned in various locations inside and outside the building.  (Tr. 59).  On December 17, 2002, Richards was contacted by Sergeant David Ramos who requested that he be permitted to review any videotapes that might exist regarding the time period from Sunday night, December 15, 2002, through the early morning of Monday, December 16, 2002.  (Tr. 64-65).  Richards informed Ramos that he could have the videotapes in question.  (Tr. 65).

**Richard Affriseo**

Affriseo testified that he was employed with the Cass County Sheriff's Department, as a Captain in the jail division.  (Trial Transcript, December 2, 2004, 109).  Affriseo testified that as of December 16, 2002, Johnny Greer was incarcerated in the Cass County Jail.  (Tr. 109-11).

**Walter Owens**

On the afternoon of Sunday, December 15, 2002, Owens and Jabar Dean traveled from Grand Rapids to Muskegon to visit Fatina Harris (a.k.a. Polly).  (Trial Transcript, December 2, 2004, 112-19).  The pair traveled to Muskegon in Dean's Escalade where they spent several hours at Polly's residence.  (Tr. 118-21).  Later that evening, Owens, Dean, Polly, and two other girls (Nina and Tina) decided to go to Rush Street.  (Tr. 121).  The group drove to the club in Dean's vehicle.  (Tr. 121).  Nina was unable to gain admittance to the club, however.  (Tr. 128-31).  Owens,

8

Dean, and Tina entered the bar while Polly and Nina departed in Dean's vehicle.  (Tr. 130-31).

Polly later returned to the bar by herself.  (Tr. 131).

Early the next morning, at approximately 1:20 a.m., Jabar Dean telephoned William

Davis (a.k.a. Hollywood).  (Tr. 114, 132).  Hollywood told Dean that he was in the Rush Street

parking lot.  (Tr. 132).  At that point, Owens, Dean, Polly, and Tina exited the bar where they

encountered Hollywood.  (Tr. 132-33).  Hollywood was sitting in his vehicle, a blue Cadillac, and

was accompanied by an individual named Flo.  (Tr. 133).  The group decided to travel to Nina's

house.  (Tr. 134).  Polly was driving Dean's vehicle with Hollywood and Flo following behind.  (Tr.

134).  Dean was sitting in the front passenger seat of his vehicle, with Owens seated directly behind

him.  (Tr. 134-35).  Tina was seated directly behind Polly.  (Tr. 135).

When they arrived at their destination, Polly pulled over to the side of the road, at

which point a black SUV drove by.  (Tr. 136-37).  Jabar Dean immediately "sat straight up in his

seat and said, 'That looks like Weewee.  Let me go hollar at Wood back here.'"  (Tr. 137-38).  With

respect to Dean's tone of voice, Owens testified that, "I ain't goin' to say he was scared but he knew

what was goin' on."  (Tr. 137).  Dean exited the vehicle and began walking back to Hollywood's

car.  (Tr. 137).  As soon as Dean exited the vehicle, Owens heard "about three or four" gunshots.

(Tr. 138).  Hollywood later told Owens that "Jay" shot Dean.  (Tr. 141).


**Fatina Harris**

Harris testified that she is also known as Polly.  (Trial Transcript, December 2, 2004,

172).  At approximately 6:00 p.m. on the afternoon of Sunday, December 15, 2002, Walter Owens

and Jabar Dean arrived at Polly's residence.  (Tr. 173-79).  Later that evening, Polly, Owens, Dean,

and two of Polly's friends, Tina and Nina, drove to Rush Street in Jabar Dean's vehicle.  (Tr. 179-80).  Nina did not have any identification with her and was, therefore, unable to enter the club.  (Tr. 181).  Owens, Dean, and Tina then entered the club while Polly borrowed Dean's vehicle to drive Nina home.  (Tr. 181-82).  As she drove to Nina's residence, Polly noticed a "black truck" whose occupants were "looking at" her "trying to see who was in" the vehicle.  (Tr. 183-84).

After Nina collected her identification, the pair returned to Rush Street, but Nina was again denied entrance to the club.  (Tr. 185-86).  So, Polly drove Nina back home and told her that she would pick her up later.  (Tr. 186-87).  Polly then returned to the club where she encountered Dean, Owens, and Tina.  (Tr. 188).  Dean later pointed out three men to Polly and stated, "there goes some of my [Grand Rapids] niggers right there."  (Tr. 188-89).  At this pont, Dean's demeanor went from "really upbeat and happy" to "precautious."  (Tr. 189-90).

Later that evening, Polly, Dean, Owens, and Tina departed the club.  (Tr. 190-91).  Immediately upon exiting the club, the group encountered Hollywood and Flo McKinney.  (Tr. 191-92).  A few minutes later, all six departed the area to go to Nina's residence.  (Tr. 192).  Hollywood and Flo were in Hollywood's vehicle with the others in Dean's vehicle.  (Tr. 192-93).  Polly was driving, Dean was sitting in the front passenger seat, and Owens and Tina were in the back seat.  (Tr. 192-93).  As Polly began driving to Nina's, a black truck "cut off" Hollywood and pulled in directly behind Polly.  (Tr. 193-94).  Polly recognized this truck as the same truck she had observed parked outside the club when she returned to the club after taking Nina home.  (Tr. 193-94).

When she arrived at Nina's residence, Polly pulled off the road, at which point the truck that had been following her "rolled past and something was said out the window."  (Tr. 194-96).  Polly did not hear what was said, but noticed that Dean immediately became "tense" and

10

responded in a "high-pitched, irregular" voice, "that's Weewee [and them]." (Tr. 196-97). Dean exited the vehicle and began walking back to Hollywood's vehicle. (Tr. 197). Dean was not carrying a weapon, so Polly assumed that Dean was going to ask Hollywood for a weapon. (Tr. 197-98). Before Dean could get to Hollywood's vehicle, Polly heard a gunshot. (Tr. 198-99). After this initial shot, Polly saw a man walk over to Dean and shoot him three more times before running away down the street. (Tr. 199-205). Polly testified that the shooter was clean shaven and was wearing wheat colored Timberland boots. (Trial Transcript, December 3, 2004, 6-7, 84). Polly later picked Petitioner out of a photographic line-up as the man that she saw shoot Jabar Dean. (Trial Transcript, December 3, 2004, 9-12; Trial Transcript, December 7, 2004, 194-209). Polly also identified Petitioner at trial as the man she saw shoot Jabar Dean. (Trial Transcript, December 2, 2004, 199-205).

At trial, Polly was shown the Rush Street surveillance videotape from the night of Dean's killing and she identified Petitioner as one of the patrons at the club that night. (Trial Transcript, December 3, 2004, 18-22). Specifically, the videotape revealed that after Polly entered the club, Petitioner, accompanied by two other men, entered 19 minutes later. (Tr. 22-27). The videotape also revealed that Petitioner and his two associates exited the club less than one minute after Polly, Owens, Dean, and Tina departed. (Tr. 28-33). Polly was also shown photographs of a vehicle seized from Vaughn Hill (a.k.a. Weewee) on December 24, 2002, as part of the investigation into Jabar Dean's killing. (Tr. 37-39). Polly testified that the vehicle in the photographs "looks very much like" the SUV she saw drive by Dean's vehicle immediately before he was killed. (Tr. 39).

11

**David Takitaki**

On the evening of December 15, 2002, through the morning of December 16, 2002, Takitaki was employed by Rush Street to "operat[e] the front door." (Trial Transcript, December 3, 2004, 105-06). In this capacity, he was responsible for ensuring that patrons complied with the establishment's "very strict" dress code. (Tr. 106-19). Pursuant to this dress code, patrons were not permitted to enter Rush Street wearing items such as tennis shoes, jogging suits, sweats, torn clothing, or bandanas. (Tr. 107).

**Terrance Glynn**

Glynn testified that was presently employed as a Special Agent with the United States Drug Enforcement Administration (DEA) and had been so employed for approximately eight years. (Trial Transcript, December 3, 2004, 121). Glynn testified that in October 2002, the DEA began a joint investigation with the Grand Rapids Police Department involving street gangs in the Grand Rapids area. (Tr. 121-22). The DEA focused on "drug trafficking and drug-related crimes" whereas the Grand Rapids Police Department focused on "the shootings and homicides." (Tr. 122). As part of his participation in this endeavor, Glynn spoke with "numerous cooperating defendants" and also conducted "a lot of" telephone, physical, and visual surveillance. (Tr. 122-23).

As a result of his efforts, Glynn learned that Vaughn Hill (a.k.a. Weewee) was a "high-ranking" member of the Wealthy Street gang. (Tr. 124-25). Glynn also learned that Darrell Mitchell was a "high-ranking" member of the Lafayette gang who "is associated with a lot of violence, a lot of different shootings." (Tr. 125). Glynn indicated that Weewee and Mitchell were associates in the drug trafficking business. (Tr. 127, 130). Glynn also learned that Deandre Fisher

12

(a.k.a. D Black) worked for Weewee as a "soldier" delivering drugs and committing acts of violence. (Tr. 125-27).  At trial, Glynn was shown the Rush Street surveillance videotape from the night of Dean's killing and he identified D Black and Weewee as two of the patrons at the club that night. (Tr. 128-30).

Glynn testified that he was "not aware" whether Petitioner was involved in gang activity, but indicated that he does not know the identities of all the individuals in the various gangs he encountered.  (Tr. 136-37, 142-43).  Glynn testified that he was much more likely to know the identity of an individual "at the top" of the gang as opposed to an "underling."  (Tr. 142-43).

**Jeff Crump**

Crump testified that he was employed as a firearms examiner for the Michigan State Police.  (Trial Transcript, December 3, 2004, 150-51).  Sergeant Crump was permitted to testify as an expert in the area of firearms examination.  (Tr. 151-52).

Crump examined four of the shell casings and the two bullet fragments recovered from the crime scene at which Alduel Jabar Dean was killed.  (Trial Transcript, December 1, 2004, 185-86; Trial Transcript, December 3, 2004, 152-54).  Sergeant Crump determined that the four shell casings, 9-millimeter in caliber, were all fired from the same weapon.  (Tr. 154, 160).  Crump further determined that the two bullet fragments were "consistent with" 9-millimeter bullets.  (Tr. 154-55).  Crump was unable to definitely state whether the two bullet fragments were fired from the same weapon, but concluded that they could have been "because they [both] had the same class rifling characteristics."  (Tr. 155).

With respect to the shell casings recovered from the June 15, 2002, and November

19, 2002 incidents in which shots were fired at Alduel Jabar Dean's vehicle, Sergeant Crump testified that such were 9-millimeter shell casings that were all fired from the same weapon. (Trial Transcript, December 1, 2004, 63, 75; Trial Transcript, December 3, 2004, 157-59). Sergeant Crump further testified that the shell casings recovered from the June 15, 2002, and November 19, 2002 incidents appeared to have been fired from a different weapon than that used to fire the shell casings recovered from the crime scene at which Alduel Jabar Dean was killed. (Tr. 159-60). Crump testified that "most" 9-millimeter firearms are semi-automatic pistols. (Tr. 164-65).

**David Caswell**

Caswell testified that he was employed as a latent fingerprint examiner with the Michigan State Police. (Trial Transcript, December 3, 2004, 170). Trooper Caswell was permitted to testify as an expert in the area of fingerprint examination and identification. (Tr. 170-72).

In January 2003, Trooper Caswell examined a DVD case recovered from Weewee's vehicle. (Trial Transcript, December 3, 2004, 168-69, 174-75; Trial Transcript, December 7, 2004, 159-61; Trial Transcript, December 8, 2004, 24-27). Caswell recovered four latent fingerprints from this DVD case, two of which matched Petitioner's right thumb and two of which matched Petitioner's right index finger. (Trial Transcript, December 3, 2004, 175-77).

**Quintina Tippens**

Tippens testified that she is also known as Tina Flowers. (Trial Transcript, December 7, 2004, 9). On the evening of December 15, 2002, Tippens traveled to Fatina Harris' (a.k.a. Polly) residence. (Tr. 12-13). Jabar Dean and Walter Owens were also present. (Tr. 13). Later that

14

evening, the group decided to go to Rush Street.  (Tr. 14).  The group, along with Nina Drummer, traveled to Rush Street in a black truck.  (Tr. 14-15, 18).  Nina was denied admittance to the club, however.  (Tr. 15).  At this juncture, Tippens, Dean, and Owens entered the club while Polly departed with Nina. (Tr. 15).  After entering the club, Tippens observed three men that were dressed differently from the other patrons.  (Tr. 16).  Tippens identified Petitioner as a member of this group.  (Tr. 16-17).  Polly later returned to the club.  (Tr. 18).

Tippens, Polly, Dean, and Owens eventually exited Rush Street.  (Tr. 20).  After exiting the club, Tippens noticed a black Yukon, with its parking lights on, parked "kitty-corner" from their vehicle.  (Tr. 20-21).  As the group walked to their vehicle, they encountered Hollywood and Flo who were riding in Hollywood's blue Cadillac.  (Tr. 21-22).  Jabar Dean spoke with Hollywood briefly, before returning to his group.  (Tr. 22-23).  Tippens, Polly, Dean, and Owens then departed in the black truck, with Hollywood and Flo following behind.  (Tr. 23).  Polly was driving the truck, Dean was in the front passenger seat, and Tippens and Owens were riding in the back seat. (Tr. 23-24).  Polly drove to Nina's residence.  (Tr. 24).  As they were traveling to Nina's, a black Yukon "cut [Polly] off, not to run [them] off the road but just to be seen like."  (Tr. 24-25).  This was the same vehicle that was parked near Polly's truck when the group exited Rush Street.  (Tr. 26).

Upon arriving at Nina's residence, Polly parked in the street and Hollywood parked behind her.  (Tr. 25).  Immediately thereafter, the same black Yukon "rolled past" their location.  (Tr. 26-27).  Jabar Dean then said, "damn, there go Weewee now."  (Tr. 27-28).  Dean then exited the truck and walked back to Hollywood's vehicle.  (Tr. 28).  A moment later, Tippens "looked back" to see what Dean was doing, at which point she witnessed Petitioner, who was clean shaven,

15

shoot Dean.  (Tr. 11, 28-31, 58-59).  Petitioner then ran up the street, followed soon thereafter by the same black Yukon.  (Tr. 29-31).

At trial, Tippens was shown the Rush Street surveillance videotape from the night of Dean's killing and she identified Petitioner and Weewee as two of the patrons at the club that night.  (Tr. 35-37).


**Nina Drummer**

On the evening of December 15, 2002, Drummer traveled to Fatina Harris' (a.k.a. Polly) residence.  (Trial Transcript, December 7, 2004, 83-84, 88).  Quintina Tippens, Jabar Dean, Walter Owens, and Rhadesia Williams were also present.  (Tr. 88-89).  Polly, Drummer, Tippens, Dean, and Owens later decided to go to Rush Street.  (Tr. 89-90).  Drummer was unable to gain admittance to the club, however, at which point she and Polly departed while Tippens, Dean, and Owens entered the club.  (Tr. 90-91).  Polly drove Drummer back to her residence.  (Tr. 91-92).

When the pair arrived at Drummer's residence, a black SUV, that had followed them from Rush Street, "pulled up alongside" Polly's vehicle and slowly drove by.  (Tr. 92-95).  Drummer retrieved her identification from her residence, at which point she and Polly returned to Rush Street.  (Tr. 96-97).  Upon returning to Rush Street, Drummer observed the same black SUV parked outside Rush Street.  (Tr. 97).  The SUV's motor was running and its parking lights were on.  (Tr. 97).  Drummer again tried without success to enter the club, at which point Polly drove her home.  (Tr. 98).  Polly told Drummer that she would return later to pick her up.  (Tr. 99).  Later that evening, Drummer received a telephone call from Polly who indicated that she was "outside."  (Tr. 99-100).  As Drummer exited her residence, she heard several gunshots.  (Tr. 100).  Drummer immediately

observed Jabar Dean laying in the street.  (Tr. 101).

**Rhadesia Williams**

Williams testified that "on a Sunday afternoon just before a man named Jabar was shot," she traveled to Fatina Harris' (a.k.a. Polly) residence.  (Trial Transcript, December 7, 2004, 112-13).  Several other people were present, including Jabar and Walt.  (Tr. 113).  Later that evening, everybody decided to go to Rush Street.  (Tr. 113).  Williams drove herself to the club and later encountered Polly, Quintina, Jabar, and Walt in the club.  (Tr. 114-15).  Williams later exited the club alone.  (Tr. 115).  Polly contacted her the following day to inform her that Jabar had been killed.  (Tr. 116-17).

**Jason Frazier**

Frazier testified that Jabar Dean was his first cousin.  (Trial Transcript, December 7, 2004, 120).  Dean told Frazier that Johnny B was responsible for the June 2002 incident in which shots were fired at him.  (Tr. 120-21).  Dean later told Frazier that the "same fellas" were responsible for the November 2002 shooting incident.  (Tr. 122).  Frazier testified that Johnny B was one of D Mitch's "little guys."  (Tr. 121).  Frazier also testified that "quite a few times" he witnessed Petitioner associating with Vaughn Hill (a.k.a. Weewee).  (Tr. 122-24).

**Howard Mayfield**

Mayfield testified that he used to associate with Petitioner, Vaughn Hill (a.k.a. Weewee), and Deandre Fisher (a.k.a. D Black).  (Trial Transcript, December 7, 2004, 132-37).

17

Mayfield also knew Jabar Dean.  (Tr. 137).  In November or early December 2002, Mayfield was at a bowling alley with Petitioner, Weewee, and several other men when they were approached by Dean. (Tr. 137-41).  Dean was drunk and carrying two handguns.  (Tr. 141).  Calling Weewee out by name, Dean stated, "you bitch-ass niggas keep shootin' at me."  (Tr. 141).

**Carmen Roman**

Roman testified that she had been in a relationship with Jabar Dean for the five years prior to his death.  (Trial Transcript, December 7, 2004, 181).  Roman testified that "a couple of weeks" before Dean died, he telephoned her early one morning.  (Tr. 185-86).  Dean was crying and told Roman that he "just pulled out a gun on Weewee and them and that he shouldn't have done that because now they were really going to get him."  (Tr. 187).

**John Franklin**

Franklin testified that he was a Lieutenant in the Muskegon County Sheriff's Department.  (Trial Transcript, December 7, 2004, 189).  In this capacity, Lieutenant Franklin was involved in the day-to-day operation of the Muskegon County Jail.  (Tr. 189).  Franklin testified that on June 8, 2004, Petitioner was booked into the Muskegon County Jail following his extradition from North Carolina.  (Tr. 190).  When asked the location of his residence, Petitioner provided two addresses, one in Grand Rapids and another in Muskegon.  (Tr. 190-91).

**David Ramos**

As of December 16, 2002, Ramos was employed as a Muskegon Heights police

18

officer. (Trial Transcript, December 2, 2004, 45). Early that morning, Sergeant Ramos spoke with Richard Russell, the manager of Rush Street to inquire about reviewing the business' security video. (Tr. 46). Ramos was able to obtain the videotapes produced by the security cameras employed by Rush Street on the night of Jabar Dean's killing. (Tr. 47-53). The videotapes were broadcast to the jury. (Tr. 67-74, 84-103).

As part of his investigation into the killing of Jabar Dean, Sergeant Ramos compiled a line-up comprised of photographs of six individuals, including Petitioner. (Trial Transcript, December 7, 2004, 194-207). On December 17, 2002, Sergeant Ramos showed this photo array to Fatina Harris (a.k.a. Polly), who "immediately" pointed to Petitioner's photograph and stated, "there's that mother-fucker right there." (Trial Transcript, December 7, 2004, 207-08; Trial Transcript, December 8, 2004, 10-11). Later that day, Ramos showed this photo array to Quintina Tippens who likewise identified Petitioner as "the shooter." (Trial Transcript, December 7, 2004, 208-09; Trial Transcript, December 8, 2004, 13).

On December 18, 2002, a warrant for Petitioner's arrest was issued, but local authorities were unable to apprehend Petitioner until he was arrested in North Carolina approximately 18 months later. (Trial Transcript, December 8, 2004, 18-19).

**Johnnie Griggs**

Griggs testified on Petitioner's behalf. Griggs testified that on December 15, 2002, he went to Rush Street with two friends where he encountered Petitioner. (Trial Transcript, December 8, 2004, 80-81). Griggs testified that Petitioner was wearing white tennis shoes, which surprised him because it violated the club's dress code. (Tr. 83-86).

19

**Kathy Tharp**

Tharp testified on Petitioner's behalf.  Tharp was called as a witness to authenticate a recording of testimony William Davis provided at a previous proceeding.  (Trial Transcript, December 8, 2004, 99-102).  Because Davis was unavailable to testify at Petitioner's trial, Davis' previous testimony was played for the jury.  A transcript of this recording does not appear in the record.

**Jason Lotts**

Petitioner testified that on the evening of December 15, 2002, he went to Rush Street with Vaughn Hill (a.k.a. Weewee).  (Trial Transcript, December 8, 2004, 105-06).  Petitioner testified that he arrived at the club wearing white tennis shoes and that Mr. Takitaki nonetheless allowed him to enter the club.  (Tr. 134).  Petitioner testified that he did not wear Timberland boots that day.  (Tr. 142).

Petitioner testified that he "knew [Weewee] from the streets" because he sold him marijuana.  (Tr. 106).  Petitioner rode to the club in Weewee's vehicle.  (Tr. 113-14).  Petitioner testified that he met a girl at the club and that the two left together to smoke marijuana in her car. (Tr. 126-29). While the two were smoking marijuana, Weewee departed the club leaving Petitioner behind.  (Tr. 126-30).  According to Petitioner, the woman with whom he was smoking marijuana drove him to Grand Rapids.  (Tr. 128-30).  Petitioner denied shooting Jabar Dean or being involved in his killing.  (Tr. 130, 144).

The day after Jabar Dean was killed, Petitioner departed for North Carolina because he had been told by a friend that he would be able to make money selling marijuana in the vicinity.

(Tr. 123-25, 148).  Petitioner acknowledged that when he was eventually arrested in North Carolina, he provided a false name to the police.  (Tr. 157).

Following the presentation of evidence, the jury found Petitioner guilty of first degree murder, possessing a firearm during the commission of a felony, and being a felon in possession of a firearm.  (Trial Transcript, December 9, 2004, 105).  Petitioner received a sentence of life in prison without the possibility of parole on the felony murder conviction, and lesser sentences for the other convictions.  (Sentence Transcript, January 10, 2005, 16).  Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I.      It was prosecutorial misconduct for the prosecutor to infer to the jury that the defendant had fled to Las Vegas, New Orleans or New York City after the crime was committed for purposes of discrediting the defendant's testimony that he went to North Carolina, where there was no evidence that supported the prosecutor's statement.
>
> II.     There was insufficient and conflicting evidence at trial to prove identity of the defendant beyond a reasonable doubt that he was the perpetrator, where the eyewitness testimony was unsupported by video tapes of the defendant at the time of the crime.

The Michigan Court of Appeals affirmed Petitioner's convictions.  *People v. Lotts*, No. 270254, Opinion (Mich. Ct. App., Oct. 23, 2007).  Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court."  *People v. Lotts,* No. 135373, Order (Mich., Mar. 24, 2008).  On September 29, 2008, Petitioner initiated the present action in which he asserts the two claims identified above.

21

**STANDARD OF REVIEW**

Lotts' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at \*4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at \*8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the

merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de

24

novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.          **Sufficiency of the Evidence**

Petitioner asserts that he is entitled to relief on the ground that the prosecution failed to present sufficient evidence to sustain convictions for first degree murder, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*,

443 U.S. at 326).

Pursuant to Michigan law in effect at the time of Jabar Dean's murder, an individual was guilty of first degree murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated.  *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992).  Premeditation and deliberation require "sufficient time to allow the defendant to take a second look."  *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992).  Premeditation and deliberation may be inferred from the circumstances surrounding the killing.  Furthermore, premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the killing.  *Id.*

Pursuant to Michigan law in effect at the relevant time, an individual was guilty of possession of a firearm during the commission of a felony if he possessed a firearm during the commission or attempt to commit a felony.  *See People v. Davis*, 549 N.W.2d 1, 4 (Mich. Ct. App. 1996).  An individual was guilty of being a felon in possession of a firearm if, after being convicted of a specified felony, he possessed a firearm.  *See* Mich. Comp. Laws § 750.224f.

Petitioner's argument is premised on his assertion that "conflicting testimony" was presented at trial on the issue of identification.  As previously noted, however, in assessing a sufficiency of the evidence claim, the Court may not weigh the evidence or assess the credibility of the witnesses.  Quintina Tippens and Fatina Harris both identified Petitioner as the man who shot Jabar Dean.  The jury obviously believed their testimony and this Court may not substitute its judgment for that of the jury.  The evidence detailed above, when viewed in a light most favorable

26

to the prosecution, is more than sufficient to support Petitioner's convictions.  As the Michigan

Court of Appeals concluded:

> Regarding the eyewitness description of the shooter, the jury was free to attribute whatever weight and credibility it believed warranted to the two eyewitnesses.  One eyewitness testified that she was able to see the shooter's face when he stopped to retrieve his black leather jacket as he was fleeing the scene of the shooting: he had light eyes, light hair, a very light complexion, was clean-shaven, and was short.  The other eyewitness testified that she saw the shooter's face as he fled the scene: he was clean-shaven and had a light complexion.  Both eyewitnesses testified that the shooter was wearing a white t-shirt, denim jeans, and brown or tan Timberland boots.  Both eyewitnesses identified defendant as the shooter.  Defendant testified that on the night of the shooting, he wore a light gray nylon jacket, blue pants, and white sneakers; he denied wearing a black leather jacket.  He also testified that he had a mustache and goatee that evening.  The security tape of the club where the victim, the eyewitnesses, and defendant were before the shooting was inconclusive regarding the color of defendant's various items of clothing, due to its poor quality.  This Court will not interfere with the jury's role of determining the weight of the evidence or the credibility of the witnesses.  Further, all conflicts in the evidence must be resolved in favor of the prosecution.
>
> \*                    \*                    \*
>
> The eyewitnesses identified defendant as the shooter, and their testimony convinced the jury that defendant was guilty of the charged offenses, in the face of defendant's testimony that he was not the shooter.  Viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented from which the jury could find beyond a reasonable doubt that defendant was the shooter.

*People v. Lotts*, No. 270254, Opinion at 1-2 (Mich. Ct. App., Oct. 23, 2007) (internal citations

omitted).

This determination is neither contrary to, nor involves an unreasonable application

of, clearly established federal law.  Furthermore, it is not based on an unreasonable determination

of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which

27

habeas relief may be granted.

## II.          Prosecutorial Misconduct

At trial, Petitioner testified that the day following Jabar Dean's murder he traveled to North Carolina to sell marijuana.  (Trial Transcript, December 8, 2004, 123-25, 148).  On cross-examination, Petitioner testified that he traveled from Grand Rapids to South Bend, Indiana by car and then traveled by bus to North Carolina.  (Tr. 148-49).  Petitioner further testified, however, that he did not know what route the bus took or what cities he traveled through.  (Tr. 149).  At this juncture, the following exchange occurred between Petitioner and the prosecutor:

> Q:     Did you actually go to North Carolina by way of Las Vegas?
>
> A:     No, sir.
>
> Q:     You've got an uncle in Las Vegas?
>
> A:     Yes, sir.
>
> Q:     Did you stop and see your uncle?
>
> A:     No, sir.
>
> Q:     Did you go by way of New Orleans for awhile?
>
> A:     No, sir.
>
> Q:     You ever been to New York?
>
> A:     Yes, sir.
>
> Q:     New York City?
>
> A:     Oh yes, sir.
>
> Q:     Did you stop by New York City on your way to North

Q:      Carolina?

A:      No, sir.

Q:      Would it surprise you if you learned that a certain law enforcement agency had actually tapped phone calls from you in all those cities after December 16th, 2002: Las Vegas, New York, New Orleans?  Would that surprise you?

A:      I don't know nothin' about it, sir.

(Tr. 150).

Petitioner's counsel objected to this line of questioning, at which point the jury was excused and the matter discussed outside their presence.  (Tr. 150-51).  Petitioner objected on the ground that the prosecutor was attempting to unfairly impeach Petitioner about an irrelevant collateral matter, at which point the trial judge asked the prosecutor "does such evidence exist?" (Tr. 151-53).  The prosecutor responded:

Yes.  I wasn't going to actually to go any further with that.  I wouldn't have even asked the hypothetical question, 'would you be surprised to know,' unless I had some kind of factual basis for it, which I do.  But I don't intend to bring in the extrinsic evidence of that.

(Tr. 151).

As for whether his line of questioning was relevant, the prosecutor asserted the following:

First of all, I don't believe that he simply was making a business trip to North Carolina that happened to coincide with the death of Mr. Dean.  I think that he was fleeing after murdering Mr. Dean and so I think it is relevant that he doesn't - he can't even say what cities he passed through on his way to North Carolina.

(Tr. 153).

29

The trial judge overruled Petitioner's objection, finding that questions about the route Petitioner took to North Carolina were relevant to help the jury evaluate Petitioner's testimony that his trip to North Carolina was planned well in advance of Jabar Dean's killing and was not, as the prosecutor asserted, a spur of the moment trip to flee the jurisdiction after murdering Jabar Dean. (Tr. 154). The trial then resumed and the prosecutor did not ask any further questions on the subject. (Tr. 157-71).

Petitioner asserts that his due process rights were violated as a result of prosecutorial misconduct. Specifically, Petitioner asserts that because there was "no evidence" that any law enforcement agency had recorded any of his telephone conversations, the prosecutor had no basis to ask him whether he would be surprised that "a certain law enforcement agency had actually tapped [his] phone calls."

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the

case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

First, contrary to Petitioner's assertion, the record contains absolutely no evidence calling into doubt the prosecutor's assertion that he possessed a factual basis to ask Petitioner if he would be surprised that "a certain law enforcement agency had actually tapped [his] phone calls."

Petitioner first raised this issue in a motion for new trial.  On April 10, 2006, the trial court held a hearing on the matter.  (Dkt. #21).[2]  At this hearing, Petitioner presented no evidence. Instead, Petitioner's counsel merely asserted that he had spoken with a detective who allegedly stated that "we've heard that like from the FBI but apparently we don't have anything."  (Hearing Transcript, April 10, 2006, 17).  Based on nothing more than this unsworn statement by counsel, Petitioner moved for a new trial.  The court denied Petitioner's motion, specifically noting that Petitioner had failed to present any *evidence* in support of his position.  (Tr. 22-23).

The Michigan Court of Appeals rejected Petitioner's appeal, finding that "[t]he prosecutor is entitled to attempt to introduce evidence that he legitimately believes will be accepted by the court, as long as that attempt does not prejudice the defendant."  *People v. Lotts*, No. 270254, Opinion at 3 (Mich. Ct. App., Oct. 23, 2007) (internal citations omitted).  The court found that there was no evidence that Petitioner was unfairly prejudiced by the exchange in question.  The court

---

[2]  Docket entry #21 contains the transcripts of both the sentencing hearing and the motion for new trial hearing.

further noted that:

> Moreover, the trial court instructed the jury that it could only consider properly admitted evidence, and specifically noted that the questions made by the attorneys to witnesses were not evidence. The trial court also instructed the jury to only accept the things the attorneys said that were supported by the evidence. Because juries are presumed to follow their instructions, any prejudice was eliminated by the instructions given by the trial court at the end of trial.

*Id.* (internal citation omitted).

Petitioner has failed to demonstrate that the prosecutor's conduct was improper. Even if the Court assumes that such was the case, Petitioner cannot demonstrate that such deprived him of the right to a fair trial. The comments in question were isolated and concerned a peripheral matter. Moreover, the evidence of Petitioner's guilt was substantial.

The decision by the Michigan Court of Appeals denying this particular claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Lotts' petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  June 27, 2011                          \_\_/s/ Ellen S. Carmody_____
                                             ELLEN S. CARMODY
                                             United States Magistrate Judge